# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ADELINE AGUILAR,

       Plaintiff,

vs.                                   No. CIV 06-1100 JB/WDS

LAS CUMBRES LEARNING SERVICES, INC.,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Las Cumbres Community Service's Motion for Summary Judgment, filed December 14, 2007 (Doc. 28)("Motion"). The Court held a hearing on February 22, 2008. The primary issues are: (i) whether the Court should consider Plaintiff Adeline Aguilar's untimely response to Defendant Las Cumbres Learning Services, Inc.'s motion for summary judgment; (ii) whether there are genuine issues of material fact whether Las Cumbres terminated Aguilar because of her age; (iii) whether Aguilar presents direct evidence that her termination was age-based; (iv) whether Aguilar makes a prima facie showing that Las Cumbres discriminated against her on the basis of age; (v) whether Aguilar makes a prima facie showing that Las Cumbres engaged in disparate treatment of Aguilar based on age; (vi) whether Las Cumbres is entitled to summary judgment on Aguilar's state-law claims for alleged violations of the New Mexico Human Rights Act ("NMHRA") claim, breach of contract, breach of implied covenant of good faith and fair dealing, and wrongful discharge. Although Aguilar's Response was untimely, the Court will consider the Response and decide Las Cumbres' motion based on the merits. Even though Aguilar does not dispute many of Las Cumbres' material facts, there are genuine issues as to some material facts whether Las Cumbres has liability to Aguilar. Aguilar does not present direct

evidence that Las Cumbres terminated her based on age, and thus must make a prima-facie showing that Las Cumbres discriminated against her based on age or engaged in disparate treatment of her based on age under the McDonnell Douglas framework.  Because Aguilar makes a prima-facie showing on age discrimination and disparate treatment based on age, Las Cumbres is not entitled to judgment as a matter of law on Aguilar's federal claims.  Moreover, because the Court is not granting summary judgment to Las Cumbres on Aguilar's federal claims, it will exercise jurisdiction over her state-law claims.  Aguilar demonstrates that there are genuine issues of material fact under the McDonnell Douglas framework for federal claims, and thus Las Cumbres is not entitled to summary judgment as a matter of law on Aguilar's NMHRA claim.   Because Aguilar does not demonstrate that she had an express or implied employment contract with Las Cumbres, Las Cumbres is entitled to summary judgment on Aguilar's state claims for breach of contract and breach of implied covenant of good faith and fair dealing.  Las Cumbres is entitled to summary judgment on Aguilar's claim for wrongful discharge, because Aguilar has remedies available to her for this claim under federal law and under the NMHRA. The Court will thus deny in part and grant in part Las Cumbres Community Service's Motion for Summary Judgment.

## FACTUAL BACKGROUND

Adeline Aguilar is a Hispanic woman.  See Complaint for Damages and Jury Demand ¶ 9, at 2, filed November 13, 2006 (Doc. 1)("Complaint").  Aguilar's Complaint based on age discrimination, breach of contract, breach of implied covenant of good faith and fair dealing, and wrongful termination stems from Las Cumbres' termination of Aguilar in January of 2003.  See Memorandum in Support of Motion for Summary Judgment by Defendant Las Cumbres Community Services, Inc at  1, filed December 14, 2007 (Doc. 29)("Las Cumbres' Memo.").  For greater than

twenty years, Aguilar worked in the nursing field, and then in residential care for handicapped clients, and was never before terminated from any job other than her job with Las Cumbres. <u>See</u> Deposition of Adeline Aguilar at 13:8-14:25 (taken November 14, 2007)("Aguilar Depo.").

Carmelita Chacon began working for Defendant Las Cumbres Community Services, Inc. in 1994. <u>See</u> Affidavit of Deborah Harris ¶ 10, at 2 (executed December 10, 2007)("Harris Aff."). Maria Zamora began working for Las Cumbres in 1997. <u>Id.</u>  Aguilar began working with Las Cumbres on November 11, 2000. <u>See</u> Complaint ¶ 9, at 2.  Chacon and Zamora were, however, younger employees than Aguilar. <u>See</u> Aguilar Depo. at 68:14-69:19, 102:4-14.

Aguilar's Complaint alleges that she had an "employment agreement" that was "express and in writing." Complaint ¶ 54, at 10.  Aguilar does not, however, have an express or "stand-alone" employment agreement with Las Cumbres.  Las Cumbres' Memo. ¶ 12, at 3. <u>See</u> Harris  Aff. ¶ 6, at 1.  Aguilar's initial disclosures did not identify an express employment agreement. <u>See</u> Motion, Exhibit G, Plaintiff's Initial Disclosures at 2-3.  Nevertheless, she maintains that she had an employment agreement with Las Cumbres because of the nature of the Employee Handbook. <u>See</u> Plaintiff's Response to Defendant's Motion for Summary Judgment, filed January 28, 2008 (Doc. 34)("Response").  Las Cumbres' Employee Handbook, from the year Aguilar was hired, notified employees that Las Cumbres did not intend for the Handbook to create an express or implied contract. <u>See</u> Motion, Exhibit E, Employee Handbook 2000 at 2 ("Employee Handbook")("This Handbook is not a contract of employment -- implied or express -- and does not guarantee employment to any employee.").  Aguilar acknowledged in writing that she received the Handbook and that the Handbook stated that there was no express or implied contract for employment. <u>See</u> Motion, Exhibit 4 ("Aguilar's Acknowledgments") at 1-4.  The waiver that Aguilar signed says:

"Las Cumbres or I can terminate the [employment] relationship at will, with or without notice or reason, at any time.  I acknowledge that this handbook is neither a contract of employment nor a legal document."  Id. at 2.

Each year that she received a new Handbook, Aguilar signed an acknowledgment stating that she was aware that the updated Employee Handbook did not create a contract and that her employment was at-will.  See Aguilar's Acknowledgments at 1 (dated November 9, 2000); id. at 2 (dated 2001); id. at 3 (dated 2004).  Aguilar asserts that she is not, and was not at the time of her hire, "an attorney fluent in legalize, capable of determining that the detailed Employee Handbook governing her employment did not constitute a binding [employment] agreement," but offers no evidence to support her statement.  Response ¶ 14, at 4.

Aguilar worked for Las Cumbres from November 11, 2000 until January 6, 2006, the date of her termination from employment, as an Assisted Living/Supported Employment Instructor.  See Response at 1; Las Cumbres' Memo. ¶ 1, at 1.  At the time of her termination, Program Director Lynn Ritchie supervised Aguilar.  See Response at 1.  Aguilar asserts that Las Cumbres positioned Chacon and Zamora as Lead Instructors over Aguilar and other older workers.  See Response ¶ 4, at 5.

Aguilar contends that she maintained a stellar employment record.  See Response at 1.  During Aguilar's employment history with Las Cumbres, she did not receive a reprimand until she was terminated.  See Aguilar Depo. at 38:6-11.  Aguilar's most recent review came on August 12, 2004.  See Response at 1.  Aguilar contends that, for the review period of October 2003 to October 2004, she received an annual review that Chacon and Zamora conducted.  See Response at 5, Exhibit C, Employee Performance Appraisal (signed by Aguilar on August 12, 2004)("October 2004

Evaluation").  The review was positive, and although it warned her of need for growth and set forth opportunities for growth, it did not specify any misconduct or violation of any policy.  <u>See</u>  October 2004 Evaluation.

It is standard practice at Las Cumbres' Tierra Amarilla office to have employees, who are temporarily without clients, work with other employees and their clients until new clients are enrolled.  <u>See</u> Harris Aff. ¶ 5, at 1.  Aguilar notes, however, that Las Cumbres consistently fails to adhere to standard practices to the detriment of employees of certain protected groups.  <u>See</u> Aguilar Depo. at 68:18-69:19 (testifying that Lynn Ritchie favored younger employees).

Aguilar contends that Chacon and Zamora began to mistreat the older workers after they became Lead Instructors.  <u>See</u> <u>id.</u> at 68:14-69:19, 102:4-14.  Throughout her testimony, Aguilar asserted that younger employees were treated in more favorable fashion than she was.  <u>See</u> <u>id.</u> at 68:18-69:19.  Aguilar's witnesses testified that Aguilar was treated differently than younger employees and was also treated poorly by younger employees.  <u>See</u> Deposition of Bertha Rivera at 14:1-15:5, 17:11-18 (taken November 12, 2007)("Rivera Depo."); Deposition of Annie Garcia at 35:18-36:10 (taken November 12, 2007)("Garcia Depo.").  Las Cumbres contends that, in response to an interrogatory by Las Cumbres, Aguilar asserted that she was treated in a disparate fashion, because Chacon and Zamora were made supervisors instead of her.  <u>See</u> Las Cumbres' Memo. ¶ 21, at 4 (citing Exhibit H, Defendant's Response to Interrogatory No. 4 ("Interrogatory No. 4 and Answer"), answered on October 1, 2007 (<u>see</u> Certificate of Service, filed October 1, 2007 (Doc. 19)).  In fact, Las Cumbres' Exhibit H contains its response to Interrogatory No. 4, which asked Las Cumbres to

> [e]xplain each and every instance where [Aguilar] was afforded an opportunity to
> correct problematic behavior, which may include allegations of improper input of

> documents or improper use of the company vehicle and time.  For each instance
> identify by date and method how Plaintiff was informed that corrective action was
> being taken and outline what expectations Plaintiff was counseled about.

Interrogatory No. 4 and Answer.  Las Cumbres answered: "Plaintiff was verbally counseled by her

supervisors throughout the fall and winter of 2004, until the time of her termination [by] supervisors

for sub-standard performance, such as improper handling of company documents and problems with

punctuality.   In accordance with Fed. R. Civ. P. 33(d), LCLS0096-104, LCLS0981-985 are

identified in further response to this interrogatory."   Id.

Aguilar's primary support for her conclusion that there was disparate treatment is her own

deposition, where she complains that Ritchie favored younger staff, in particular Chacon and

Zamora, who were also supervisors.  See Aguilar Depo. at 68:14-69:19.  Her examples of this

favoritism were that Ritchie "communicated" more with Chacon and Zamora, and that she would

have lunch with them.  Id.

Aguilar contends that on October 21, 2004, she worked with a client, TF, during the day,

who had requested that Aguilar take him home because he needed to rest.  See Response at 1.

Aguilar asserts that, later that day, TF called Aguilar, upset because Chacon had insisted that he go

exercise, even though he was exhausted from working for three hours.  See id.  Aguilar contends

that, after receiving this telephone call, she followed up with Chacon and asked her why Chacon

took the TF to exercise.  See id. at 1-2.

Aguilar asserts that Chacon falsely told her that TF was required to go exercise.  See id. at

2.  While what occurred between Chacon and TF is not material, Aguilar contends that she informed

Chacon that she had dropped TF off and then went back to work to complete paperwork until 3:30

p.m.  See id.  Aguilar represents that Chacon stated that Aguilar's actions were fine.  See id.  Aguilar

asserts that, in ensuing months, she continued to perform her job duties to the best of her ability, and did not receive any reprimands or warning of reprimand, verbally or in writing.  See id.  Aguilar represents that on January 4, 2005, however, she found a note on her desk from Chacon, instructing her to meet with Chacon, Galen Gurule, and Zamora.  See id.

Aguilar contends that, when she met with these employees, Gurule told Aguilar that he was in possession of a document that Aguilar had produced and that they were investigating.  See id.  Aguilar contends that she requested information regarding this document, but was refused any information.  See id.  Aguilar represents that Galen proceeded to place Aguilar on a week of administrative leave without pay pending investigation.  See id.  Aguilar represents that Gurule demanded her office key and notified her that he would call her by Friday to tell her whether she could return to work.  See id.

Las Cumbres represents that Aguilar was terminated "after her supervisors reported to management that she turned in a time sheet on October 21, 2004, that misrepresented that she worked a full shift when, in fact, she spent part of the claimed hours with her boyfriend."  Harris Aff. ¶ 7, at 1.  When management learned of Aguilar's alleged misrepresentation, her supervisors were told to watch for instances of similar behavior by her.  See id. ¶ 8, at 1.  After management received additional reports from Aguilar's supervisors that she had been seen at her boyfriend's place of employment when she was supposed to be working, management decided to terminate her employment with Las Cumbres.  See id. ¶ 9, at 2.  Aguilar contends that Las Cumbres prematurely and wrongfully terminated her without evidence to substantiate her termination, and without providing her with any means of defending her position.  See Aguilar Depo. at 36:16-37:24.

Las Cumbres subsequently terminated Aguilar's employment on January 6, 2005.  See

Complaint ¶ 9, at 2.  Aguilar was terminated from Las Cumbres after her supervisors reported to upper management that she turned in a time sheet for October 21, 2004, which misrepresented that she had worked a full shift when, in fact, she spent part of the claimed hours with her boyfriend.  See Harris Aff. ¶ 7, at 1.  Aguilar denies having spent part, or any, of her claimed work hours with her boyfriend.  See Aguilar Depo. at 142:5-17.  Aguilar's witnesses support her contention.  See Garcia Depo. at 32:7-11; Piña Depo. at 7:22-8:3.

Aguilar contends that she committed an inadvertent technical error on a document on October 21, 2004.  See Aguilar Depo. at 32:17-33:20.  Aguilar contends that similarly situated employees regularly made the same or similar reporting errors without being subject to the same adverse actions.  See id. at 40:25-43:13.  Aguilar maintains that the standard practice at the Tierra Amarilla office was that employees were allowed to correct documentation errors, which applied not only to staff members, but also to Lead Instructors.  See id.

Aguilar contends that Las Cumbres did not afford her any right to respond to any allegations against her and that Las Cumbres did not provide the reasons for her termination.  See Response at 2.  Aguilar asserts that she was not given a termination letter.  See id.  Aguilar argues that she was not granted an appeal process.  See id.  Aguilar asserts that she was left without any means of disproving the allegations against her.  See id.  At the time of her termination, Aguilar was forty-five years old.  See Aguilar Depo. at 45:18-25.

Aguilar's Complaint, deposition, and response to the motion for summary judgment contain many alleged explanations for her termination.  Aguilar testified in her deposition that she had been fired as retaliation for two things: (i) reporting co-workers to her supervisor for drinking at a Las Cumbres-sponsored trip to a Toby Keith concert; and (ii) reporting co-workers to her supervisors

for drinking at the Las Cumbres holiday party.  <u>See</u> Aguilar's Depo. at 46:18-47:16, 51:8-10, 52:24-53:24.  Aguilar contends in her response to the motion for summary judgment, however, many other reasons for her termination, including discrimination based on her age, sex, and national origin.  <u>See</u> Response at 2 (stating, "Plaintiff filed a Charge of Discrimination . . . based on age, national origin, and gender,  alleging that [the] Defendant discriminated against her.").

Aguilar's Complaint alleges that she was fired because one of her supervisors, Chacon, had lost a client and needed to take Aguilar's client to save her job.  <u>See</u> Complaint ¶ 52, at 10. Aguilar's Complaint also alleges that she was fired out of revenge because she had shot Chacon's brother-in-law in self-defense.  <u>See</u> Complaint ¶ 29, at 5-6.  Aguilar contends, however, that she only partially attributes her termination to Chacon's retaliatory motive against her based on Aguilar having shot her brother-in-law in self defense.  <u>See</u> Aguilar Depo. at 146:19-149:2.  And in her deposition, Aguilar testified that she did not think her termination was in revenge for the shooting and that the shooting did not play a role in her detention.  <u>See</u> <u>id.</u> at 29:19-30:4.  Later in her deposition, however, she attributed her termination partially to Chacon's retaliatory motive against her based on Aguilar having shot her brother-in-law in self defense.  <u>See</u> <u>id.</u> at 146:19-149:2.

Las Cumbres contends that Chacon, to whom Aguilar's client was eventually reassigned, would not have lost her job if she was without a client at the end of 2004 and beginning of 2005. <u>See</u> Harris Aff. ¶ 4, at 1.  Aguilar responds that, if an employee had no client, that employee would have had no basis for employment.  <u>See</u> Response ¶ 8, at 3.  Aguilar cites no evidentiary support, however, for her contention.  <u>See</u> <u>id.</u>  Aguilar admits that she is unaware of any facts indicating that her age was the reason, or a reason, for her termination.  <u>See</u> Aguilar Depo. at 46:18-47:16; 52:24-53:13, 55:11-16, 98:14-100:4. The witnesses identified by Aguilar confirm that they have no

knowledge of facts indicating that Aguilar's age was the reason or a reason for her termination.  See Rivera Depo. at 53:15-17; Garcia Depo. at 63:11-64:1.

After Aguilar's termination, nobody was hired to replace her.  See Harris Aff. ¶ 3, at 1; Rivera Depo. at 53:12-14; Garcia Depo. at 23:22-24.  Aguilar contends, however, that Zamora -- who was already an employee of Las Cumbres -- immediately obtained Aguilar's former client, TF, as her own when Aguilar left.  See Response ¶ 5, at 3, Exhibit D, Ted Fernandez Statement at 1-2 (dated April 12, 2005)(notarized by Cindy C. Martinez)("TF Statement").  Las Cumbres contends that it was Chacon who eventually took over Aguilar's client.  See Reply Brief in Support of Motion for Summary Judgment ¶ 5, at 3-4, filed February 14, 2008 (Doc. 37)("Reply").

Aguilar represents that she filed a Charge of Discrimination with the New Mexico Human Rights Division ("NMHRD") and the United States Equal Employment Opportunity Commission ("EEOC") based on age, national origin, and gender, alleging that Las Cumbres discriminated against her in violation of the New Mexico Human Rights Act ("NMHRA"), Title VII of the Civil Rights Act, and the Age Discrimination in Employment Act ("ADEA), all as amended.  See Response at 2-3. Aguilar represents that, on October 5, 2006, the EEOC issued Aguilar a Dismissal and Notice of Rights.  See id. at 3.

## PROCEDURAL BACKGROUND

Aguilar timely brought suit for violations of the NMHRA, Title VII, and the ADEA, and for wrongful discharge, breach of contract, and breach of implied covenant of good faith and fair dealing.  See Complaint ¶¶ 53-71, at 10-13. Las Cumbres moves the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, for summary judgment.  See Motion at 1.

Aguilar sought an extension of time to file her response and appears to have had sufficient

time to file her response within the extension of time given to her. <u>See</u> Unopposed Motion to Extend the Deadline for Plaintiff's Response to Defendant's Motion for Summary Judgment and to Vacate and Reset the Motion Hearing Scheduled for January 24, 2008, filed January 17, 2008 (Doc. 30). Nevertheless, Aguilar failed to file her response on January 25, 2008, as the Court's order allowing the extension required. <u>See</u> Stipulated Order to Extend the Deadline for the Plaintiff to Respond to Defendant's Motion for Summary Judgment and to Vacate the Motion Hearing Scheduled for January 24, 2008, filed January 22, 2008 (Doc. 31); Notice of Completion of Briefing of Defendant's Motion for Summary Judgment Filed December 24, 20078 [Dkt. 28, 29], filed January 28, 2008.   Aguilar also did not advise Las Cumbres' counsel that the response would not be filed on January 25.

On Monday, January 28, 2008, Las Cumbres filed a Notice of Completion of Briefing, <u>see</u> Doc. 32, stating that, because Aguilar had failed to submit her response brief on time, briefing was closed.   <u>See id.</u>   After Las Cumbres filed the Notice of Completion of Briefing, Aguilar's counsel called Las Cumbres' counsel regarding the failure and then filed her response.   <u>See</u> Transcript of Hearing (taken February 22, 2008)("Tr.") at 21:22-25 (Vigil).[1] Aguilar attempted to file her response to the motion for summary judgment at 10:48 a.m. on January 28, 2008.   <u>See</u> Doc. 33.   Aguilar properly filed her response to the motion for summary judgment at 3:35 p.m. on January 28, 2008. <u>See</u> Doc. 34.

At the February 22, 2008 hearing, Aguilar contended that she made a good-faith attempt to file her response to Las Cumbres' motion for summary judgment, but the PDF file was too large,

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

and there was an error in the program and it would not accept the file.  See Tr. at 21:1-11 (Vigil).

Aguilar agreed that Gamez v. Country Cottage Care and Rehabilitation, 377 F.Supp.2d 1103, 1120

(D.N.M. 2005)(Browning, J.), set forth the applicable prima-facie test for her case.  See Tr. at 23:14-

18 (Court & Vigil).  Las Cumbres contended that, even if the Court were to find that its non-

discriminatory reasons for firing Aguilar were pretextual, Aguilar would have to prove that her firing

was on the basis of age.  See Tr. at 14:5-9 (Bartell).  Las Cumbres conceded that it had not done any

research on that particular point, but indicated that it would be glad to do so.  See id. at 15:1-2

(Bartell).

On February 27, 2008, Las Cumbres submitted additional briefing on its motion for summary

judgment.  See Supplemental Brief in Support of Motion for Summary Judgment by Defendant Las

Cumbres Community Services, Inc. at 1, filed February 27, 2008 (Doc. 40)("Supplemental Brief").

In its Supplemental Brief, Las Cumbres contends that Aguilar cannot satisfy the fourth prong of the

prima-facie test for age discrimination, because Aguilar cannot demonstrate that "'a younger person

replaced her.'"  Supplemental Brief at 2 (quoting Gamez v. Country Cottage Care and Rehab., 377

F.Supp.2d at1120).  Las Cumbres asserts that Aguilar is arguing that "Carmelita Chacon engineered

her termination because she needed to take over [Aguilar]'s client to save her own job."

Supplemental Brief at 2.  Las Cumbres argues:

> The uncontroverted evidence, however, is that Carmelita Chacon would not have lost
> her job is she was temporarily without a client.  Nor is there any evidence that
> Carmelita Chacon was promoted or reassigned to plaintiff's job.  Instead, Ms.
> Chacon took on plaintiff's work in addition to her supervisory responsibilities simply
> because somebody had to be responsible for servicing the client.  To hold that the
> mere redistribution of work to already-existing employees in the absence of any
> other hint of age discrimination would turn Gamez on its head.

Id. Las Cumbres further contends that, "[n]evertheless, if the Court assumes for the sake of the

argument that [Aguilar]'s allegations against Ms. Chacon are true (despite the lack of evidence), [Aguilar] still has not made a prima facie case of discrimination because her explanation for Ms. Chacon's behavior is <u>non-discriminatory</u>."  <u>Id.</u> at 3 (emphasis in original).

Las Cumbres asserts that Aguilar cannot demonstrate its non-discriminatory reasons are pretextual.  Las Cumbres contends that Aguilar "argues, in substance, that she was really fired because of her disagreements with staff regarding alcohol at work functions.  However, the 'real' reasons offered by [Aguilar] for her termination are not discriminatory in nature, Las Cumbres is entitled to summary judgment."  <u>Id.</u> at 5.  Las Cumbres asserts that its non-discriminatory reason for terminating Aguilar is that "management was informed that she had submitted time sheets stating that she was working when she was not."  <u>Id.</u> at 3.  Las Cumbres contends that Aguilar must demonstrate "that Deborah Harris[, Acting Executive Director for Las Cumbres Community Services from August 2004 to June 2005, and current Director of Training and Supervision for Las Cumbres,] had reason to doubt the veracity of the information she was receiving in order to demonstrate that Las Cumbres' non-discriminatory explanation is pretextual."  <u>Id.</u> at 4.  Las Cumbres asserts that Aguilar has explained she was fired "for two reasons, both involving her having disagreements with staff regarding alcohol at work-related functions."  <u>Id.</u> (citing Aguilar Depo. at 52:24-53:1, 55:11-16).  Las Cumbres contends that Aguilar also asserted that nobody was disciplined for violations of company policies.  <u>See</u> Supplemental Brief (citing Complaint ¶ 35, at 7).  Las Cumbres argues

> [i]f nobody was disciplined based on a complaint made by [Aguilar], then there was no reason for Deborah Harris to wonder why the reports she received about [Aguilar]'s behavior were based on the desire to retaliate against her.  Thus, [Aguilar] has failed to establish that Las Cumbres management had any reason to doubt the reports it was receiving regarding her misconduct, and it remains undisputed that management had a legitimate, non-discriminatory reason for

terminating her employment.

Supplemental Brief at 4.

## LAW GOVERNING MOTIONS FOR SUMMARY JUDGMENTS

Rule 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant has "the initial burden to show that there is an absence of evidence to support the nonmoving party's case." Mirzai v. State of N.M. Gen. Servs. Dep't, 506 F.Supp.2d 767, 774 (D.N.M. 2007)(Browning, J.)(internal quotations omitted).  That is, the moving party has the initial burden to demonstrate absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the movant meets that burden, then the burden shifts to the nonmovant "to present specific, admissible facts from which a rational trier of fact could find for the nonmovant." Velasquez v. Frontier Med., Inc., 375 F.Supp.2d 1253, 1262 (D.N.M. 2005)(Browning J.).  The nonmovant must set forth specific facts and cannot rely only on his or her pleadings.  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671 (10th Cir. 1998).  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  Id.

"For the purposes of summary judgment, the court assumes the evidence of the nonmoving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor." Velasquez v. Frontier Med., Inc., 375 F.Supp.2d at 1263 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  Summary judgment is appropriate if there is no genuine issue of

material fact.  See Trujillo v. Bd. of Educ., Albuquerque Pub. Sch., 410 F.Supp.2d 1033, 1039 (D.N.M. 2005)(Browning, J.).  "An issue of fact is 'genuine' if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  "Essentially, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Velasquez v. Frontier Med., Inc., 375 F.Supp.2d at 1263 (internal quotations and citations omitted).

## LAW REGARDING ADEA CLAIMS

The ADEA prohibits employers from "discharg[ing] any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).  A plaintiff in an age discrimination case must prove that the employer acted, at least in part, on a motivation based on age.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000)("[T]he plaintiff's age must have actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.")(alteration in original and internal quotations omitted).

At the summary judgment stage,  the nonmoving party must come forth with proof that can be met either by demonstrating direct evidence of the employer's discriminatory intent or by using circumstantial evidence that creates an inference of age bias under the McDonnell Douglas framework.  And the plaintiff need only show that one or more contradicted factual issues about the elements of the prima -facie case or pretext appear from the materials submitted to the court in connection with the motion under  the McDonnell Douglas framework.

### A.       DIRECT EVIDENCE.

"Direct evidence is evidence, which if believed, proves the existence of a fact in issue

without inference or presumption." Hall v. U.S. Dep't of Labor, 476 F.3d 847, 855 (10th Cir. 2007).

Moreover, "[d]irect evidence demonstrates on its face that the employment decision was reached

for discriminatory reasons." Danville v. Reg'l Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002).

"When a plaintiff alleges that discriminatory comments constitute direct evidence of discrimination,

[the Tenth Circuit] has held that the plaintiff must demonstrate a nexus exists between the alleged

discriminatory statements and the . . . decision to terminate [the employee]." Negrete v. Maloof

Distrib. L.L.C., No. CIV 06-0338 JB/LFG, Memorandum Opinion and Order at 39, filed November

28, 2007 (Doc. 146)(internal quotations omitted).   "Direct evidence is that which demonstrates a

specific link between the alleged discriminatory animus and the challenged [employment] decision,

sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually

motivated [the employer's] decision to take the adverse employment action." Deneen v. Nw.

Airlines, 132 F.3d 431, 436 (8th Cir. 1998).

### B.    McDONNELL DOUGLAS FRAMEWORK.

"[C]laims of age, race, national origin, gender discrimination, and retaliation are all subject

to the burden shifting framework that the Supreme Court established in McDonnell Douglas Corp.

v. Green." Gamez v. Country Cottage Care and Rehab., 377 F.Supp.2d at 1119 (citing McDonnell

Douglas Corp. v. Green, 411 U.S. 792, 802-804 (1973)).   Under the McDonnell Douglas framework,

a plaintiff must set forth a prima facie case of discrimination.   See Kelly v. City of Albuquerque, 375

F.Supp.2d at 1210.   If the plaintiff establishes a prima facie case for any of his discrimination claims,

"the burden shifts to the defendant to come forward with a legitimate non[-]discriminatory reason

for its employment related decision." McDonnell Douglas Corp. v. Green, 411 U.S. at 802.   "Upon

the employer's articulation of a legitimate, non[-]discriminatory reason . . . the presumption of

discrimination established by the prima facie case simply drops out of the picture." Kelly v. City of Albuquerque, 375 F.Supp.2d at 1210 (internal quotations omitted).  The plaintiff then must present evidence that the defendant's proffered reason for the employment decision was pretextual. See id. (citing Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)).

### C.      PRIMA-FACIE CASE OF AGE DISCRIMINATION.

Using the McDonnell Douglas framework, the plaintiff must present evidence showing a prima-facie case of discrimination.  See O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 311 (1996); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-253 (1981); Greene v. Safeway Stores, Inc., 98 F.3d 554, 558 (10th Cir. 1996).  To make a prima-facie case of age discrimination, an employee must show that: "(i) she is within the protected age group; (ii) she was doing satisfactory work; (iii) she suffered some adverse employment action; and (iv) a younger person replaced her." Gamez v. Country Cottage Care and Rehab., 377 F.Supp.2d at 1120.  "An adverse employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a  decision causing a significant change in benefits." Whitaker v. San Jon Sch., No. CIV 04-1237 JB/WDS, 2006 WL 1308234 at *7 (D.N.M. April 19, 2006)(Browning, J.).

"While the replacement by an older or insignificantly younger worker does not per se doom a prima facie case if both are within the protected age group, the evidence must nevertheless be adequate to create an inference that the adverse employment decision was, in fact, motivated by [the] plaintiff's age." Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d 1136, 1146 (10th Cir. 2008)(emphasis in original).  "But whether the claim arises under the ADEA or another antidiscrimination statute, the fourth element of a prima facie case is a flexible one that can be

satisfied differently in varying scenarios . . . . [W]hen a plaintiff is not replaced by a younger worker . . . a plaintiff may satisfy the fourth element with a more general showing that his discharge occurred under circumstances which give rise to an inference of discrimination." Bolton v. Sprint/United Mgmt. Co., 220 Fed.Appx. 761, 766 (10th Cir. 2007).

In Adamson v. Multi Community Diversified Services, Inc., a plaintiff relied upon a Tenth Circuit case, Greene v. Safeway Stores, Inc., 98 F.3d 554 (10th Cir. 1996), to argue that he made a prima facie case of discrimination based on age because: "Specifically, [he contended that] comments he made to a board member regarding plans to retire some time in the future gave rise to an inference that the board's subsequent decision to terminate his employment was discriminatorily motivated independent of any inference established or not established by meeting the fourth prong of the prima facie case." 514 F.3d at 1146. The Tenth Circuit explained that when a plaintiff relies exclusively on the McDonnell Douglas framework, any value Green v. Safeway Stores, Inc. has is "strictly through analogy." Adamson v. Multi Cmty. Diversified Servs., Inc., 514 F.3d at 1146. The Tenth Circuit held that the plaintiff in Adamson v. Multi Community Diversified Services, Inc. failed to make a prima facie case on the fourth prong, because "[f]acts demonstrating that [the plaintiff] had disclosed to board members some months before his termination an unspecified plan to retire have no nexus to, and fall short of . . . [demonstrating] discriminatory animus." Id. at 1147.

If the plaintiff can meet this burden of demonstrating a prima facie case, then the employer must demonstrate a non-discriminatory reason for the complained-of action. See McDonnell Douglas v. Green, 411 U.S. at 802.

### D.       PRIMA-FACIE CASE OF DISPARATE TREATMENT.

In Martinez v. United States Department of Energy, 170 Fed.Appx. 517 (10th Cir. 2006), the

Tenth Circuit explained:

> To prevail on a disparate treatment claim under Title VII of the Civil Rights Act, the employee must show the employer intentionally discriminated against him for a reason prohibited by the statute. If, as here, the employee relies on circumstantial evidence, we apply the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green. Similarly, we analyze age discrimination cases brought pursuant to the Age Discrimination in Employment Act under the identical analytical framework established in McDonnell Douglas.

170 Fed.Appx at 521 (internal citations and quotations omitted).  See Garrison v. Gambro, Inc., 428 F.3d 933, 936-37 (10th Cir. 2005)(stating that "[w]e analyze the age and sex discrimination claims identically); Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1216 (10th Cir.2002) (noting that the three-step analytical framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 . . . for disparate-treatment claims brought under Title VII also applies to ADEA claims.").

A plaintiff must demonstrate that: (i) she is a member of a protected class; (ii) she suffered an adverse employment action, and (iii) similarly situated employees were treated differently.  See Velasquez v. Frontier Med. Inc., 375 F.Supp.2d at 1271.   "'A claim of disparate treatment encompasses a situation where the employer simply treats some people less favorably than others because of [an impermissible basis]."  Id. (quoting Mitchell v. City and County of Denver, 112 Fed.Appx. 662, 670 (10th Cir. 2004).  "To assert a claim of disparate treatment, the plaintiff must show that he was treated differently than other similarly situated employees who violated work rules of comparable seriousness."  Aramburu v. The Boeing Co., 112 F.3d at 1403.

"Individuals are considered 'similarly-situated' when they [(i)] have dealt with the same supervisor; [(ii)] were subjected to the same work standards; and [(iii)] had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their

conduct or the employer's treatment of them for it." Buhendwa v. Univ. of Colo. at Boulder, 214 Fed.Appx. 823, 828 (10th Cir. 2007).   A court should compare "the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated." Id. (citing David v. City and County of Denver, 101 F.3d 1344, 1359-60 (10th Cir. 1996)).  "When comparing the relative treatment of similarly situated . . . employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1233 (quoting Elmore v. Capstan, Inc., 58 F.3d 525, 530 (10th Cir. 1995)).

### E.        A LEGITIMATE, NON-DISCRIMINATORY REASON.

The plaintiff has an obligation to provide sufficient evidence to disbelieve the employer's legitimate, non-discriminatory reason for terminating her.  See Guyton v. Ottawa Truck Div., Kalmar Indus. U.S.A., Inc., 15 Fed.Appx. 571, 577 (10th Cir. 2001).   The relevant inquiry is not whether the employer's proffered non-discriminatory reasons "were wise, fair, or correct," but whether the employer "honestly believed those reasons and acted in good faith upon those beliefs." Id. (internal quotations omitted).  "[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1231.

"[T]he defendant's burden at this stage is one of production, not one of persuasion."  Mirzai v. State of N.M. Gen. Servs. Dep't, 506 F.Supp.2d at 775.  "If the defendant is successful in articulating some legitimate, non-discriminatory reason, 'the presumption of discrimination established by the prima facie showing "simply drops out of the picture."'"  Id. (quoting Bryant v.

Farmers Ins. Exch., 432 F.3d 1114, 1125 (10th Cir.2005)(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993))).  Once the employer counters with a non-discriminatory explanation, the burden then shifts back to the plaintiff, who is required to offer specific evidence that demonstrates the employer's reasoning is pretextual.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).

###        F.        PRETEXT.

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgon v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)(internal quotations omitted).   A plaintiff's mere conjecture that her employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.  See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).

A plaintiff typically shows pretext in one of three ways:

[i] with evidence that the defendant's stated reason for the adverse employment action was false; [ii] with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or [iii] with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

Green v. New Mexico, 420 F.3d 1189, 1193 (10th Cir. 2005).  "The plaintiff is not required to present evidence of actual discrimination to establish pretext, because '[e]vidence tending to show pretext permits an inference that the employer acted for discriminatory reasons.'"  Mirzai v. State

of N.M. Gen. Servs. Dep't, 506 F.Supp.2d at 776.

"'[T]he pertinent question in determining pretext is not whether the employer was right to

think the employee engaged in misconduct, but whether that belief was genuine or pretextual.'"

Falcon v. Trustees of the State Colleges in Colo., 216 F.3d 1087 (Table), 2000 WL 779860 at *4

(10th Cir. 2000)(quoting Hardy v. S.F. Phosphates L.C., 185 F.3d 1076, 1080 (10th Cir. 1999)). "A

plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company

practice often does so by providing evidence that he was treated differently than other similarly-

situated employees who violated work rules of comparable seriousness." Kendrick v. Penske

Transp. Servs., Inc., 220 F.3d at 1230.

A plaintiff cannot, however, be forced to pursue any particular means of demonstrating a

defendant's proffered non-discriminatory reason is pretextual. See id. Moreover, a plaintiff is not

required to introduce sufficient evidence to find both that the employer's reasons are false and the

real reason is discrimination. See Guyton v. Ottawa Truck Div., Kalmar Indus. U.S.A., Inc., 15

Fed.Appx. at 577.

"'[T]he pertinent question in determining pretext is not whether the employer was right to

think the employee engaged in misconduct, but whether that belief was genuine or pretextual.'"

Falcon v. Trustees of the State Colleges in Colo. 216 F.3d 1087 (Table), 2000 WL 779860 at *4

(10th Cir. 2000)(quoting Hardy v. S.F. Phosphates L.C., 185 F.3d 1076, 1080 (10th Cir. 1999)). As

the Court explained in Mirzai v. State of New Mexico General Services:

> The plaintiff is not required to present evidence of actual discrimination to establish
> pretext, because evidence tending to show pretext permits an inference that the
> employer acted for discriminatory reasons. In the context of a motion for summary
> judgment, the inference of discrimination must be resolved in favor of the plaintiff.

Although the burden of production under the McDonnell Douglas framework shifts

from the plaintiff to the defendant and back, the plaintiff bears the ultimate burden of proving intentional discrimination.  Nevertheless, at the summary judgment stage, if a plaintiff advances evidence establishing a prima facie case and evidence upon which a factfinder could conclude that the defendant's alleged non[-]discriminatory reasons for the employment decision are pretextual, the case should go to the factfinder.

Id. at 776 (internal citations and quotations omitted).

The United States Court of Appeals for the Tenth Circuit recently reiterated the Court's

position in Swackhammer v. Sprint/United Management Co., 493 F.3d 1160 (2007):

However the plaintiff may choose to demonstrate pretext, we have definitively rejected a "pretext plus" standard; in order to survive summary judgment, a plaintiff generally need not provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered explanation is pretextual. Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1312 (10th Cir.2005); see also Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1135-36 (10th Cir.2003) ("The plaintiff need not show both that the defendant's reasons were a pretext and that the real reason was discrimination-the fact of pretext alone may allow the inference of discrimination."). We do not always require actual evidence of discrimination because, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose . . . . Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." Reeves, 530 U.S. at 147, 120 S.Ct. 2097.

Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d at 1168.  The Tenth Circuit further explained:

[I]t is not always permissible for the factfinder to infer discrimination from evidence that the employer's explanation is unworthy of belief. [I]f the record conclusively revealed some other, non[-]discriminatory reason for the employer's [adverse employment] decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred, the fact that the employer's explanation was unworthy of belief would no longer be sufficient to create an inference of discrimination. The same reasoning applies to a plaintiff's attempts to show pretext through evidence of differential treatment; if the employer's differential treatment of similarly-situated employees is trivial or accidental or explained by a non[-]discriminatory motive, such treatment is insufficient to create an inference of discrimination.

Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d at 1168. These exceptions to the general rule against "pretext plus" defeat summary judgment only if "the evidence of pretext supports only non[-]discriminatory motives . . .  and summary judgment for the employer is appropriate."  Id.

In Swackhammer v. Sprint/United Management Co., the Tenth Circuit held that the plaintiff's attempts to demonstrate pretext by showing evidence of the falsity of the employer's explanation were unsuccessful and did not raise a genuine issue of material fact, because all the employee showed was that the employer may have been unwise and exercised questionable judgment, but did not "draw into question whether [the employer] actually relied, honestly and in good faith, upon the appearance of impropriety arising from evidence gathered [in its investigations]." Id. at 1169-70.  The plaintiff's attempts to demonstrate pretext by showing that she was treated differently than another similarly situated employee were also unsuccessful, because if the factfinder credited the employer's alternative explanations, then the differential treatment arose either because the plaintiff's misconduct was more serious than the similarly situated employee, or because the similarly situated employee was good friends with the supervisor.  See id. at 1172. Neither explanation was discriminatory, because "[t]he record contain[ed] no independent evidence, beyond [the plaintiff]'s mere conjecture, that would allow a reasonable factfinder to disbelieve both explanations and thereby infer that gender discrimination was the actual motivation for her termination."  Id. In conclusion, "either [the plaintiff's misconduct] was more egregious and therefore merited a harsher response, or her supervisor's close friendship with [a similarly situated employee] lead to [the similarly situated employee] receiving favorable treatment.  Neither of these explanations allows a reasonable factfinder to reach an inference of illegal gender discrimination." Id. at 1173.

### G.    CAT'S PAW.

"The 'cat's paw' doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire." EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d 476, 484 (10th Cir. 2006).  "As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none left for the cat." Id.  In employment discrimination cases, the term "refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." Id. The rubber-stamp doctrine "refers to a situation in which a decisionmaker gives perfunctory approval for an adverse employment action explicitly recommended by a biased subordinate." Id. Under these doctrines, the "issue is whether the biased subordinate's discriminatory reports, recommendation, or other action caused the adverse employment action." Id. at 487.  An employer can avoid liability, however, "by conducting an independent investigation of the allegations against an employee." Id. at 488.  "In that event, the employer has taken care not to rely on the say-so of the biased subordinate, and the causal link is defeated [between the allegedly discriminatory workplace statements and the termination decision]." Id.  See Schulte v. Potter, 218 Fed.Appx. 703, 719 (10th Cir. 2007)(indicating that the cat's paw theory would be applicable in an age-discrimination claim).          For a plaintiff to prevail on a cat's paw theory claim, he or she "must show that a biased subordinate's discriminatory reports, recommendations, or other actions caused the adverse employment action." Hamby v. Associated Cent. for Therapy, 230 Fed.Appx. 772, 780 (10th Cir. 2007).  "[A]n employer can avoid liability by conducting an independent investigation of the allegations against an employee." EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450

F.3d at 488.

In <u>EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles</u>, the Tenth Circuit held that Cesar Grado, a District Sales Manager, had broad responsibility to bring facts to the attention of the Human Resources Department, which was ultimately responsible for deciding whether to take any disciplinary action. <u>See id.</u> at 478. The plaintiff produced evidence that Grado had made "many race-based remarks" and may have used a racial epithet to describe the plaintiff. <u>Id.</u> at 489. The Tenth Circuit determined that summary judgment was inappropriate, because a factfinder could conclude that the plaintiff's termination was caused by Grado's false information to the decisionmaker. <u>See id.</u> at 492.

The Tenth Circuit held that summary judgment was inappropriate, although the decisionmaker directed another employee to pull the plaintiff's personnel file. <u>See id.</u> The Tenth Circuit found the decisionmaker's actions insufficient to constitute investigation. <u>See id.</u> (stating that the decisionmaker's "investigation [was] inadequate, as a matter of law, to defeat the inference that . . . Grado's racial bias tainted the decision.")(internal quotations omitted). The Tenth Circuit explained that the problem was the decisionmaker "never sought any other version of events, and therefore had no other reason other than . . . Grado's report to believe that the file was relevant." <u>Id.</u> at 493. The Tenth Circuit held that summary judgment was inappropriate, even though the decisionmaker did not know the race of the plaintiff and maintained that race had no part in her decision to terminate the plaintiff. <u>See id.</u> at 481; <u>Flitton v. Primary Residential Mortgage, Inc.</u>, 238 Fed.Appx. 410, 418 n.5 (10th Cir. 2007)(holding that summary judgment was inappropriate, because the Tenth Circuit's "caselaw permits [it] to impute the biases of subordinates to an ultimate decisionmaker if 'the biased subordinate's reports, recommendation, or other actions caused the

adverse employment action'" and the record revealed that the decisionmaker may have been persuaded to fire the plaintiff based on the actions of a biased subordinate)(quoting EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at 487).

### NEW MEXICO LAW REGARDING EMPLOYMENT CONTRACT

Under New Mexico law, unless there is an explicit contract of employment stating otherwise, employment is terminable at will.  See Sanchez v. The New Mexican, 106 N.M. 76, 78, 738 P.2d 1321, 1323 (1987)("[U]nless there is an explicit contract of employment stating otherwise, employment is terminable at will.")(internal quotations omitted).   "New Mexico recognizes two exceptions to this general rule, however: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge."  Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 10, 918 P.2d 7, 10 (internal quotations omitted).  The Supreme Court of New Mexico has explained that "whether an implied contract exists is a question of fact, and it may be 'found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct.'"  Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 10, 918 P.2d at 10 (quoting Newberry v. Allied Stores, Inc., 108 N.M. at 427, 773 P.2d at 1234). In Lukoski v. Sandia Indian Management Co., 106 N.M. 664, 748 P.2d 507 (1988), the Supreme Court of New Mexico clarified

> We do not mean to imply that all personnel manual will become part of employment contracts.  Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason.  Such actions instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual.  However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's

actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it.  Having announced a policy, the employer may not treat it as illusionary.

106 N.M. at 666-67, 748 P.2d at 509-10 (internal quotations omitted).

In addition to any express employment contract that might govern an employer-employee relationship, under New Mexico law, "a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could <u>reasonably</u> expect his employer to conform to the procedures it outlined." <u>Cockerel v. Bd. of Regents of N.M. State Univ.</u>, 2002-NMSC-009, ¶ 26, 45 P.3d 876, 887 (quoting <u>Newberry v. Allied Stores, Inc.</u>, 108 N.M. 424, 427, 773 P.2d 1231, 1234 (1989))(emphasis added).  For a personnel manual to create contractual rights, however,  its terms "must be sufficiently explicit to create a <u>reasonable</u> expectation of an implied contract." <u>Trujillo v. N. Rio Arriba Elec. Coop., Inc.</u>, 2002-NMSC-004, ¶ 22, 41 P.3d 333, 342 (emphasis added).

"An employer's representations which give rise to a reasonable expectation that employees will be terminated only for good cause, may create an implied contract." <u>Kiedrowski v. Citizens Bank</u>, 119 N.M. 572, 575, 893 P.2d 468, 471 (Ct. App. 1995).  "The reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation of conduct relied upon." <u>Hartbarger v. Frank Paxton Co.</u>, 115 N.M. 665, 673, 857 P.2d 776, 784 (1993). "If the representations are sufficiently explicit, a jury may find that a contract is implied in fact to restrict the absolute power of the employer to discharge at will." <u>Id.</u> (internal quotations omitted).  Before a party's "expectations can be reasonable, they must satisfy a certain threshold of objectivity." <u>Id.</u> The Court of Appeals of New Mexico held summary judgment was inappropriate where the employee handbook "contained detailed disciplinary procedures . . . . [requiring] managers to

respond with progressive discipline, in a gradually escalating fashion, first with an oral warning,

then a written warning, written probation, suspension, and finally, termination." Id. at 576, 893 P.2d

at 472.  The Court of Appeals of New Mexico found that:

> the [employer's] systematic application of its termination policies could reasonably
> create an expectation in Plaintiff that the same would be done in her case.  There is
> at least a genuine issue of material fact, for resolution by the jury, as to whether the
> [employer's] handbook, combined with the [employer's] actual practices and
> representations, created an expectation of an implied-in-fact contract term limiting
> the employer's right to terminate at will.

Id. (internal quotations omitted).  The employee handbook in Kiedrowski v. Citizens Bank provided

that:

> It should be clearly understood that the policies described herein are not to be
> construed, in any manner whatsoever, as establishing any relationship between [the
> employer] and any of its employees.  Either the employee or the [employer] may
> exercise the option to terminate the employment relationship at any time and for any
> reason.

Id. at 470, 893 P.2d at 574.  "To support the existence of an implied contract, an oral representation

must be sufficiently explicit and definite."  Gormley v. Coca-Cola Enterprises, 2004-NMCA-021,

¶ 20, 85 P.3d 252, 259.  "A factual showing of additional consideration or mutual assent to the terms

of the implied contract is not required."  Id.  "The question of whether an employment relationship

has been modified is a question of fact."  Hartbarger v. Frank Paxton Co., 115 N.M. at 670, 857 P.2d

at 781.

## NEW MEXICO LAW REGARDING BREACH OF
## IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

"Whether express or not, every contract in New Mexico imposes the duty of good faith and

fair dealing upon the parties in the performance and enforcement of the contract." WXI/Z Sw. Malls

v. Mueller, 2005-NMCA-046, ¶ 25, 110 P.3d 1080, 1087. A cause of action for breach of an implied

covenant of good faith and fair dealing cannot prevail without an accompanying showing for breach of a contract. See Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, ¶ 51, 68 P.3d 909, 925; Martinez v. N.M. Dep't of Health, No. CIV 04-1326 JB/RLP, 2006 WL 4079690 at *14 (D.N.M. December 4, 2006)(Browning, J.)(granting summary judgment on the claim for breach of implied covenant of good faith and fair dealing, because the Court found that the plaintiff had not established breach of an implied employment contract.).  "Whether express or not, every contract in New Mexico imposes the duty of good faith and fair dealing upon the parties in the performance and enforcement of the contract.  The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." WXI/Z Sw. Malls v. Mueller, 2005-NMCA-046, ¶ 25, 110 P.3d at 1087.  "The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement.  Denying a party its rights to those benefits will breach the duty of good faith implicit in the contract."  Planning and Design Solutions v. City of Santa Fe, 118 N.M. 707, 714, 885 P.2d 628 635 (1994).

## LAW REGARDING THE NEW MEXICO HUMAN RIGHTS ACT

The NMHRA forbids "an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because . . . age."  N.M.S.A. 1978, § 28-1-7(A).  The Supreme Court of New Mexico applies the McDonnell Douglas framework "[w]hen considering a violation of the NMHRA." Juneau v. Intel Corp., 2006-NMSC- 002, ¶ 9, 127 P.3d 548, 551.  The Supreme Court of New Mexico has stated that, "when considering claims under the NMHRA, we may look at

federal civil rights adjudication for guidance in interpreting the NMHRA. Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own." Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 23, 91 P.3d 58, 68 (citations and internal quotations omitted).  The Supreme Court of New Mexico has noted, however, that the framework it applies to discrimination claims under the NMHRA is as follows: "[A]n employee bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. The employee then has the opportunity to rebut the employer's proffered reason as pretextual or otherwise inadequate." Juneau v. Intel Corp., 2006-NMSC- 002, ¶ 9, 127 P.3d at 551 (citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802-05 and Gonzales v. N.M. Dep't of Health, 2000 -NMSC- 029, ¶ 21, 11 P.3d 550, 558.  This approach is the same as the McDonnell Douglas framework.

### LAW REGARDING WRONGFUL DISCHARGE

New Mexico recognizes a cause of action for wrongful termination. See Garcia v. Middle Rio Grande Conservancy Dist., 1996 -NMSC- 029, ¶ 10, 918 P.2d 7, 10 (stating that "in New Mexico an employment contract is for an indefinite period and is terminable at the will of either party unless there is a contract stating otherwise. New Mexico recognizes two exceptions to this general rule, however:  wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge.")(internal quotations and citations omitted).  New Mexico courts created the tort of wrongful discharge "as a means of redress for the very limited situation in which an employee has no other means of protection against an employer's breach of public policy. If the employee already has some protection, either because of

an employment contract or through another cause of action, the tort is unnecessary and will not be recognized." Salazar v. Furr's, Inc., 629 F.Supp. 1403, 1409 (D.N.M. 1986).

This tort is limited. In Salazar v. Furr's Inc., the Honorable Santiago E. Campos, United States District Judge, declined to allow the plaintiff to bring her wrongful discharge claim because the claim was identical to her Title VII claim based upon sex. See 629 F.Supp. at 1408. Judge Campos stated that, because "the public policies that may have been violated . . . can be vindicated under the federal legislation, and perhaps under the New Mexico Human Rights Act as well, the Court finds that the tort of wrongful discharge will not lie." Id. The Court continued by stating that, "[w]here a remedy other than this tort is available to Plaintiff to redress the discharge, the policy which underlies New Mexico's recognition of the tort, that of softening the terminable at will rule, does not favor recognizing a cause of action." Id.

Moreover, "[t]his Court . . . has repeatedly refused to recognize a claim for retaliatory discharge where other remedies are available to vindicate the alleged public policy violation. Specifically, we have refused to recognize an employer's alleged Title VII violation as a basis for this tort." McDonald v. Corr. Corp. of Am., 181 F. Supp. 2d 1274, 1282-83 (D.N.M. 2002)(Baldock, J., Circuit Judge sitting by designation).  See Mayo v. Fowler Fitness, Inc., No. CIV 02-0222 JB/RLP, Memorandum Opinion and Order at 40-42, filed October 8, 2003 (Doc. 99)(noting that the plaintiff did not dispute that her claim for wrongful termination was identical to and indistinguishable from Title VII claims alleging retaliation and, because the plaintiff had identical remedies available to her under Title VII, the defendant was entitled to judgment as a matter of law on her wrongful termination claim), aff'd, 110 Fed.Appx. 69 (10th Cir. 2004).  Cf. Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 2002-NMSC-004, ¶ 20, 41 P.3d 333, 341 (holding that, "[b]ecause [the

-32-

plaintiff]'s discharge did not violate the Human Rights Act, his claim of wrongful discharge in violation of public policy must fail.")

## ANALYSIS

The Court will consider Aguilar's Response to Las Cumbres' motion for summary judgment, although Aguilar's Response was untimely.  Even though Aguilar does not dispute many of the assertions in Las Cumbres' statement of material facts, there remain genuine issues about material facts necessary to determine whether Las Cumbres has liability to Aguilar for age discrimination. Aguilar does not present direct evidence that Las Cumbres terminated her based on age, and thus must make a prima-facie showing that Las Cumbres discriminated against her based on age or that Las Cumbres engaged in disparate treatment of her, based on age, under the McDonnell Douglas framework.  Because Aguilar makes a prima-facie showing, Las Cumbres is not entitled to judgment as a matter of law on Aguilar's federal claims.  Moreover, because the Court is not granting summary judgment to Las Cumbres on Aguilar's federal claims, it will exercise jurisdiction over her state-law claims.  And because Aguilar demonstrates that there are genuine issues of material fact for her federal age-discrimination claims, Las Cumbres is not entitled to summary judgment as a matter of law on Aguilar's NMHRA claim.   Las Cumbres is entitled to summary judgment on Aguilar's state claims for breach of contract and breach of implied covenant of good faith and fair dealing, because Aguilar does not demonstrate that she had an express or implied employment contract with Las Cumbres.  Las Cumbres is entitled to summary judgment on Aguilar's claim for wrongful discharge, because Aguilar has remedies available to her for this claim under her federal law and the NMHRA. The Court will thus grant in part and deny in part Las Cumbres Community Service's Motion for Summary Judgment.

## I.     **THE COURT WILL CONSIDER AGUILAR'S UNTIMELY RESPONSE**.

As an initial matter, Aguilar's response was untimely.  Aguilar failed to file her brief as scheduled and further failed to notify counsel for Las Cumbres in a timely fashion that the response would not be forthcoming.  Under the local rules, the Court could, with some basis, not accept the response brief and enter judgment for Las Cumbres.  See D.N.M.LR-Civ. 7.1(b)("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion.").

The Court has decided, however, under the circumstances, that it should consider Aguilar's late-filed response.  There was only a brief delay, and some of the delay related to filing under the Court's new computer system.  Also, the Tenth Circuit has directed district courts to decide motions for summary judgment, as much as possible, on the merits and not because of some procedural default. If the Court grants Las Cumbres' motion for summary judgment, it should be because there is not a genuine issue of material fact and because Las Cumbres is entitled to judgment as a matter of law, not because of a procedural default.

## II.    **THERE ARE GENUINE ISSUES OF MATERIAL FACT.**

Aguilar does not dispute many of Las Cumbres' statements of material fact.  While Aguilar denies some facts are undisputed, Aguilar does not introduce competent evidence to show a dispute on many of Las Cumbres' statements.  Thus, most of the statements remain undisputed.  For the most part, Aguilar seeks only to have the Court consider additional evidence.  Thus, very few facts, if any, are genuinely disputed with competent, admissible evidence or with more than argument. The dispute is more with the materiality of some of the facts than with whether the record supports Las Cumbres' factual assertions.  The dispute in this case is more with the legal consequences of

some facts than its with the facts themselves.

In response to a number of paragraphs in Las Cumbres' Statement of Undisputed Facts, Aguilar states: "Plaintiff is without information to dispute or agree with Defendant's Fact . . . , deeming it a disputed material fact." Response ¶¶ 17-18, 20, at 4, 5. While this response may be sufficient in a responsive pleading, it is not sufficient at the summary judgment stage. Merely stating that she is unaware whether it is true is not tantamount to a genuine dispute, and these facts must be deemed admitted. The denials fail to refute the facts that Las Cumbres has set forth using specific evidentiary support, and thus do not, as the Federal Rules of Civil Procedure and caselaw require, create a genuine issue of material fact. Thus, Aguilar's attempt to dispute such factual assertions with this stock response must fail. Nevertheless, there are genuine issues as to the material facts necessary to determine whether Las Cumbres has liability to Aguilar. For example, Aguilar has introduced additional evidence that her work was satisfactory before her termination. Also, she introduces evidence that she was replaced by a younger employee.

## III. AGUILAR PRESENTS NO DIRECT EVIDENCE THAT HER TERMINATION WAS AGE-BASED.

"Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." Hall v. U.S. Dep't of Labor, 476 F.3d at 855. Moreover, "[d]irect evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." Danville v. Reg'l Lab Corp., 292 F.3d 1246, 1249 (10th Cir. 2002). Aguilar has not offered direct evidence that her termination was based on age. Moreover, Aguilar's Complaint alleges that she was treated in a disparate fashion, because she was fired "on the basis of charges much less serious than those committed by other employees and . . . the aforementioned employees . . . continue[d] working without disciplinary action being taken against [them] for more

egregious violations of company policies."  Complaint ¶ 70, at 13.  Aguilar does not, however, identify in the Complaint whom these younger employees were, or what they did that was "more egregious." Id.

In her deposition, Aguilar was asked why she thought she had been fired.  Her response was that she thought she had been fired as retaliation for two actions: (i) reporting co-workers to her supervisor for drinking at a Las Cumbres sponsored trip to a Toby Keith concert; and (ii) reporting co-workers to her supervisors for drinking at the Las Cumbres holiday party.  See Aguilar Depo. at 46:19-47:16, 52:24-53:13, 55:11-16.  This argument fails to constitute direct evidence of age discrimination.  First of all, the actions in which Aguilar alleges her co-worker engaged are not the same as the reasons for her termination.  In other words, Aguilar has not demonstrated that younger co-workers made mistakes or misrepresented their time cards and were not terminated.  Therefore, Aguilar has not offered any direct evidence that the alleged disparate treatment was based on her age.

Additionally, to the extent Aguilar also asserts that she was treated in a disparate fashion, because Chacon and Zamora were made supervisors instead of her, this argument is flawed.  First, both Chacon and Zamora had been with Las Cumbres several years longer than Aguilar.  See Harris Aff. ¶ 10, at 2.  Second, Aguilar's cause of action challenges her termination, not a failure to promote.  Such a failure-to-promote claim was not brought before the NMHRD or the EEOC.  To the extent that Aguilar suggests that she has a claim for failure to promote, she has failed to exhaust her administrative remedies.  See Sonntag v. Shaw, 2001-NMSC-15, ¶ 22 P.3d 1188 (stating that, "[u]nder the NMHRA, a plaintiff must exhaust his or her administrative remedies against a party before bringing an action in district court against that party.").

In the absence of direct evidence of age discrimination, Aguilar must rely on circumstantial evidence for the inference that her termination was motivated by her age.  The McDonnell Douglas three-part framework applies to this analysis.

## IV.    AGUILAR HAS MADE A PRIMA-FACIE SHOWING OF AGE DISCRIMINATION.

Las Cumbres contends that Aguilar cannot satisfy the first step in the McDonnell Douglas test because she is unable to make a prima-facie showing of age discrimination.  To make a prima-facie case of age discrimination,  Aguilar must show that: "(i) she is within the protected age group; (ii) she was doing satisfactory work; (iii) she suffered some adverse employment action; and (iv) a younger person replaced her."  Gamez v. Country Cottage Care and Rehab., 377 F.Supp.2d at 1120 (citing Miller v. Eby Realty Group, L.L.C., 396 F.3d 1105, 1111 (10th Cir.2005) and Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000)).  In the light most favorable to Aguilar, the Court believes that Aguilar has made the prima-facie showing required to satisfy the first part of the McDonnell Douglas analysis.   The parties do not dispute two of the elements of the prima-facie test, and Aguilar has introduced sufficient evidence to create a genuine issue of material fact on the remaining two elements.   Accordingly, the Court concludes that Las Cumbres is not entitled to summary judgment as a matter of law on the prima-facie case.

### A.    AGUILAR IS IN THE PROTECTED AGE GROUP.

"In a typical ADEA case based on discharge, a plaintiff establishes a prima facie case by showing that he . . .  is within the protected age group (i.e., at least forty years old, see 29 U.S.C. § 631(a))."  Bolton v. Sprint/United Mgmt. Co., 220 Fed.Appx. 761, 766 (10th Cir. 2007).  Aguilar is thus in the protected age group.  At the time of her termination, Aguilar was forty-five years old. See Aguilar Depo. at 45:18-25; Gamez v. Country Cottage Care and Rehab., 377 F.Supp.2d at 1124-

25 (holding that the plaintiff was in the protected age group, because she was over forty-years old).

    **B.**    **THERE IS A GENUINE ISSUE OF MATERIAL FACT REGARDING WHETHER AGUILAR'S WORK PERFORMANCE WAS SATISFACTORY.**

There is evidence that Aguilar's work performance was not satisfactory. Specifically, Aguilar's supervisors reported to management that she was observed at her boyfriend's place of employment on October 21, 2004, during hours that Aguilar claimed she was working, either with a client or at the Las Cumbres office. See Harris Aff. ¶¶ 7-9, at 1-2. When management learned of this issue, they asked Aguilar's supervisors to watch for additional instances of such behavior by Aguilar. See Harris Aff. ¶ 8, at 1.

Once management learned from Aguilar's supervisors that she had been seen at her boyfriend's place of employment on another occasion when she was supposed to be working, they made the decision to terminate her. See Harris Aff. ¶ 9, at 2. Las Cumbres maintains that the decision to fire Aguilar was based on a non-discriminatory job performance problem: Aguilar had been misrepresenting the hours she worked on her time cards. Although Aguilar "vehemently denies having spent part, or any, of her claimed work hours with her boyfriend," Response ¶ 16, at 4, she does not dispute Las Cumbres' assertion of material facts, including:

> 17. When management learned of [Aguilar]'s misrepresentation, her supervisors were told to watch for instances of similar behavior by her.
>
> 18. After management received additional reports from plaintiff's supervisors that she had been seen at her boyfriend's place of employment when she was supposed to be working, management decided to terminate plaintiff's employment with Las Cumbres.

Las Cumbres' Memo. ¶¶ 17-18, at 4. In response to these material facts, Aguilar states that she "is without information to dispute or agree with [these material facts], deeming it a disputed material fact." Response ¶¶ 17, 18, at 4.

-38-

Moreover, although Aguilar contends that her time sheet error was "a single inadvertent technical error on a single document," she does not dispute that she made an error.  Response ¶ 5, at 5.  Aguilar's mere expression that "she is without information to dispute or agree" with Las Cumbres' material facts is not tantamount to a genuine dispute, and these facts must be deemed admitted.  Las Cumbres' material facts contained in paragraphs 17 and 18 of its motion for summary judgment are thus deemed admitted.

Nevertheless, there is a genuine issue of material fact whether Aguilar "was doing satisfactory work."  Gamez v. Country Cottage Care and Rehab., 377 F.Supp.2d at 1120. Aguilar contends she maintained a stellar employment record.  See Response at 1. During Aguilar's employment history with Las Cumbres, she did not receive a reprimand until she was terminated.  See Aguilar Depo. at 38:6-11.  Aguilar's most recent review came on August 12, 2004.  See Response at 1.  Aguilar contends that, for the review period of October 2003 to October 2004, she received an annual review that Chacon and Zamora conducted.  See October 2004 Evaluation at 1.  The review was positive, and although it warned her of need for growth and set forth opportunities for growth, it did not specify any misconduct or violation of any policy.  See id.  While Las Cumbres' statement of material facts are deemed admitted, Aguilar has introduced competent evidence that she was doing satisfactory work.  Thus, there is a genuine issue of material fact whether Aguilar's work performance was satisfactory before her termination.

## C.    AGUILAR SUFFERED AN ADVERSE EMPLOYMENT ACTION.

"An adverse employment action constitutes a significant change in employment status, such as . . . firing."  Id.  "Conduct rises to the level of adverse employment action when it constitutes a significant change in employment status, such as . . . firing . . . or a decision causing a significant

change in benefits." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003).  Aguilar thus

suffered an adverse employment action.  Aguilar was terminated from her employment with Las

Cumbres.  See Whitaker v. San Jon Schools, 2006 WL 1308234 at *7.

###    D.    THERE IS A GENUINE ISSUE OF MATERIAL FACT WHETHER SOMEONE REPLACED AGUILAR.

Las Cumbres maintains that Aguilar cannot make a prima-facie showing of age

discrimination because nobody was hired to replace her.  See Harris Aff. ¶ 3, at 1; Rivera Depo. at

53:12-14; Garcia Depo. at 23:22-24.   The Court disagrees, however, with Las Cumbres'

interpretation of this element as requiring  "hiring" a younger person.  The Court believes that, if

the client, TF, whom Zamora purportedly took from Aguilar, was Aguilar's only client, so that in

effect Zamora took over the entirety of Aguilar's work, then Aguilar could satisfy this element by

demonstrating that a younger person replaced her.

In Gamez v. Country Cottage Care and Rehabilitation, the Court noted that the fourth

element of the prima facie case for age discrimination is "a younger person replaced [the plaintiff]."

377 F.Supp.2d at 1120.  The Court used the word "replaced" rather than "hired to replace."

Moreover, "whether the claim arises under the ADEA or another antidiscrimination statute, the

fourth element of a prima facie case is a flexible one that can be satisfied differently in varying

scenarios . . . . [W]hen a plaintiff is not replaced by a younger worker . . . a plaintiff may satisfy the

fourth element with a more general showing that his discharge occurred under circumstances which

give rise to an inference of discrimination." Bolton v. Sprint/United Mgmt. Co., 220 Fed.Appx. at

766.

Aguilar contends that Zamora took Aguilar's client as her own.  See Complaint ¶ 52, at 10

("[Aguilar] states that when she was wrongfully terminated, Ms. Chacon lost her own client and that

when [Aguilar] was terminated, Ms. Chacon picked up [Aguilar]'s former client which in effect saved Ms. Chacon's job.  This was reason enough for Ms. Chacon to make the allegations against [Aguilar] as Ms. Chacon had an ulterior motive for the accusations made against [Aguilar].").  There is some evidence in the record that Aguilar had only one client when she stopped working at Las Cumbres.  In her deposition, Bertha Rivera, a co-worker of Aguilar testified:

> Q.    How many clients did Ms. Aguilar have when she stopped working at Las Cumbres?
>
> A.    I think she had just the one.
>
> Q.    Just the one?
>
> A.    Yeah.

Rivera Depo. at 53:22-54:1.  Aguilar has thus introduced some evidence to demonstrate that she had only one client when she was working at Las Cumbres.

On the other hand, Aguilar does not argue in her response to Las Cumbres' motion for summary judgment that she had only a single client.  Moreover, assuming, as the Court must with the record before it, that Aguilar had only one client at Las Cumbres, there is conflicting information regarding whether Chacon took over TF after Aguilar was terminated.  Rivera testified:

> Q.    And do you know who took that client right after Ms. Aguilar left?
>
> A.    I believe Carmen [Chacon] did.
>
> Q.    Do you remember Annie Garcia taking that client?
>
> A.    Annie?
>
> Q.    (Indicating.)
>
> A.    I don't think so, but I can't answer that for sure, for sure.

Rivera Depo. at 54:2-10.  Garcia testified:

> Q.   And who, then, if you know, began working with Ted Fernandez right after [Aguilar] left?
>
> A.   I met Carmelita at the store in Dulce.  I was working with Donnalyn.  And she told me that I would have to work with Ted for about two weeks because she had some paperwork that she had to take care of.  She told me I was going to have to work with him for two weeks.

Garcia Depo. at 23:25-24:7.  Las Cumbres represents that it was its standard practice to "have employees who are temporarily without clients work with other employees and their clients until new clients are enrolled."  Las Cumbres' Memo. ¶ 7, at 2; Harris Aff. ¶ 5, at 1.

The Court concludes that Aguilar has introduced sufficient competent evidence to demonstrate that she was replaced by a younger person.  While Las Cumbres may be able to show that Aguilar is wrong, there appears to be a genuine issue of fact, because the evidence is in conflict. Accordingly, Aguilar has made a prima-facie showing of age discrimination.

## V.   AGUILAR HAS MADE A PRIMA-FACIE SHOWING OF DISPARATE TREATMENT BASED ON AGE.

To make a prima-facie case for disparate treatment based on age, Aguilar must demonstrate that: (i) she is a member of a protected class; (ii) she suffered an adverse employment action, and (iii) similarly situated employees were treated differently.  See Orr v. City Of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005); Velasquez v. Frontier Medical Inc., 375 F.Supp.2d at 1271 (citing Trujillo v. Univ. of Colo. Health Sciences Cent., 157 F.3d 1211, 1215 (10th Cir. 1998)). There is no doubt that Aguilar belongs to a protected class and that she has suffered an adverse employment action.  The issue is whether Aguilar has produced sufficient evidence to demonstrate that similarly situated employees were treated differently.

In her Response, Aguilar contends that "other similarly situated employees regularly made the same or similar types of reporting errors without being subject to the same adverse actions."

Response at 9.  In her deposition, Aguilar testified:

Q:      . . . If there was a documentation problem how would the staff be given an opportunity to correct?

A:      The lead instructors, or before the lead instructors?

Q:      Before you had lead instructors?

A:      They would tell us this needs to be corrected, this does not match this and you forgot to sign here or you forgot to check your box.  They would just make us aware of that and we would read it and we would put in the information we needed to, or sometimes they themselves would do it, you know.

Q:      They would just change it?

A:      You know, but we were able to, like I said, to correct our documents and our paperwork.

*  *  *  *

Q:      How were the document problems fixed before you had lead instructors?

A:      We would -- how would it would get fixed, we would send our paperwork to the Espanola office and Lynn and Theresa Maestas and Rosita Rodriguez and Phaedra Marcus, and I don't know if they took turns checking our documents or what, but they would call and say, this wasn't right.   You are not documenting and not just me, the other staff also, and they said we're going to have to go down there and show you girls how to document and what you need to do.  And so they would come back with our documents and Lynn would show us, you know, you got to do this, you got to put in your box, you got to mark this one, when it is supposed to be there or change that, you know, so with the staff.

Q:      Now because I'm not familiar, intimately familiar with the time sheets you guys use, could you explain to me the types of problems that would occur that the Espanola staff would show you about?  And when I say you, I mean everybody?

A:      Again, it was, like, the not checking in your direct and indirect box and/or your signature.  Or let's say you wrote -- wrote -- okay.  For an example, different paperwork stayed at the office, da-da-da-da, then would mark the wrong box, and they would have us correct it or vice versa.  They would have

> us correct it because they would read what we wrote down for the day.  And
> then they would check, look at your box and, you know, the time, and that is
> what they would have us correct when they came from Espanola.

Aguilar Depo. at 40:25-41:17, 42:7-43:13.  Garcia testified that "We always had a chance to correct

our paperwork.  There were times I would not total my hours.  A lot of times it was like: Coming

in at 8:30, maybe leave at 4:15, and sometimes my calculations did not match.  And Maria -- Maria

Zamora and Carmen said they would calculate the hours, and they would correct it.  And they would

correct it for us, our paperwork . . . .And they would always  . . . help us correct  . . . our paperwork,

direct or indirect, they would always correct it for us before the paperwork was sent in to the main

office in Espanola."  Garcia Depo. at 14:16-15:11.  Aguilar contends that Richard Franco of the

Finance Department issued a memorandum to all staff regarding time-clock violations, but no

employees were terminated.  See Response at 12.  Aguilar does not, in her Response, however, name

any employees that she contends made the same reporting errors or engaged in time-clock violations.

Accordingly, Las Cumbres argues that Aguilar fails to establish that there were similarly situated

employees who were engaged in time-clock violations. On the other hand, in her Complaint, Aguilar

alleges that Chacon and Zamora made reporting errors similar to those she made and was terminated

for, but were not, unlike Aguilar, terminated.  See Complaint ¶ 25, at 5.  In addition, Aguilar alleges

that she was treated differently, because Chacon and Zamora purportedly took "excessive advantage

of their break periods to make personal stops, without suffering any reprisal."  Response at 12.

The Court is not convinced that Aguilar has failed to produce sufficient comparisons for the

Court to determine whether similarly situated employees were treated more favorably than her.

While there is some indication in the record that Chacon and Zamora acted in a supervisory capacity

over her, see Motion, Exhibit H, Defendant's Responses to Plaintiff's Interrogatories to Defendant

-44-

at 1, Complaint ¶ 11, at 3, the Court does not understands how Chacon and Zamora's supervisory role is relevant to time-clock violations.  When the Court compares "the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated," Velasquez v. Frontier Medical Inc., 375 F.Supp.2d at 1271, it believes all relevant employees were similarly situated regarding the time-clock rule, because there is no indication in the record that Chacon and Zamora were not required to keep time sheets.  Thus, the Court believes Aguilar has demonstrated that there is a genuine issue of material fact regarding whether Chacon and Zamora's alleged reporting errors, and taking excessive advantage of break times, were treated more favorably than Aguilar's reporting error, because Chacon and Zamora were not terminated for these alleged infractions.

Additionally, Aguilar's universe of discrimination involving similarly situated employees is not limited to those who violated the time-clock rule.  Aguilar asserts that Las Cumbres "intentionally acted in a disparate manner towards discharging [her] on the basis of charges much less serious than those committed by other employees and in permitting the aforementioned employees to continue working without any disciplinary action being taken against [them] for the more egregious violations of company policy."  Complaint ¶ 70, at 13.  For this broader universe of conduct, Aguilar provides specific comparisons to argue that similarly situated employees violated work rules, were treated differently than her, and were not terminated.  Aguilar contends that Gurule, Zamora, and Chacon

> were observed shopping for alcohol to sneak into a 'field trip' concert to which they took handicapped clients.  These very same employees were observed consuming this alcohol in the presence of clients, absurdly even sharing the liquor with clients while dirty dancing (clients who could have likely been on medications drastically

dangerous combined with alcohol).

Response at 10-11.  See Garcia Depo. at 20:19-21:24 (stating that she saw Gurule drink from a bottle

of Smirnoff Ice at a Toby Keith concert, which he and Maria offered to her).  Aguilar argues that

"Gurule later took full responsibility for the field trip drinking incident, yet did not suffer adverse

employment action, to [Aguilar]'s knowledge."  Response at 11.

"Individuals are considered 'similarly-situated' when they [(i)] have dealt with the same

supervisor; [(ii)] were subjected to the same work standards; and [(iii)] had engaged in the same

conduct without such differentiating or mitigating circumstances that would distinguish their

conduct or the employer's treatment of them for it."  Buhendwa v. Univ. of Colo. at Boulder, 214

Fed.Appx. at 828.  There is no indication that Gurule, Zamora, and Chacon had the same supervisor

as Aguilar.  In its responses to Aguilar's Interrogatories, Las Cumbres stated that Chacon was a Lead

Supervisor at the Tierra Amarilla Office and that Ritchie is a former Adult Services Program

Manager.  See Motion, Exhibit H, Defendant's Responses to Plaintiff's Interrogatories to Defendant

at 1.  Gurule is a former Assistant Program Manager.  See id.  Aguilar contends that she was

supervised by Ritchie, and that Chacon and Zamora were her Lead Instructors.  See Response at 1.

There is no indication in the record that Gurule was supervised by Ritchie.  There is no indication

that Ritchie supervised Chacon and Zamora, and Aguilar characterizes them as her Lead Instructors.

See Buhendwa v. Univ. of Colo. at Boulder, 214 Fed.Appx. at 828.  In Aguilar's Complaint, she

indicates that Zamora and Chacon evaluated her employment performance, suggesting that they

worked with her in a supervisory capacity.  See Complaint ¶ 11, at 3.

On the other hand, although the exact work circumstances of Chacon, Zamora, and Gurule

are unclear, all employees were to follow the standards set forth in the Employee Handbook.  See

-46-

Employee Handbook at 2 (stating that the Handbook is "intended to cover the procedures, rules, and policies most often applied to day-to-day work activities."). Section 1.13 of the Employee Handbook provides, in relevant part:

> The unlawful manufacture, possession, distribution, transfer, purchase, sale, use, or being under the influence of alcoholic beverages or illegal drugs while on [Las Cumbres] property is prohibited. Such activity is also prohibited while on client residential property, while attending business-related activities, while representing [Las Cumbres], while on duty, or while operating a vehicle or machine leased or owned by [Las Cumbres]. Violation of this policy will lead to disciplinary action that may include suspension without pay or dismissal.

Response, Exhibit G, Employee Handbook, § 1.13. Aguilar has produced evidence that Gurule, Chacon, and Zamora may have violated this section of the Employee Handbook. While Gurule, Chacon, and Zamora were supervisors at Las Cumbres, the Employee Handbook does not exempt supervisors from abiding by Section 1.13 of the Employee Handbook. Because Section 1.13 provides that violation of it may lead to dismissal, the Court believes Aguilar has shown that "[s]he was treated differently than other similarly situated employees who violated work rules of comparable seriousness." Aramburu v. The Boeing Company, 112 F.3d at 1403. Thus, Aguilar appears to have produced sufficient evidence in the record to show that there is a genuine issue of material fact whether Chacon, Zamora, and Gurule were similarly situated to her.

Because Aguilar has met her burden of demonstrating there are genuine issues of material fact on her prima-facie cases of discrimination based on age, and disparate treatment based on age, Las Cumbres must demonstrate a non-discriminatory reason for the complained-of action. See McDonnell Douglas v. Green, 411 U.S. at 802.

## VI.   LAS CUMBRES HAS OFFERED A LEGITIMATE, NON-DISCRIMINATORY REASON FOR AGUILAR'S TERMINATION.

Las Cumbres contends that it has given a non-discriminatory reason for terminating her

employment: Aguilar misrepresented that she was working when she was, in fact, visiting her boyfriend.  See Harris Aff. ¶¶ 7-9, at 1-2.  The relevant inquiry is not whether Las Cumbres' proffered non-discriminatory reason "w[as] wise, fair, or correct," but whether the employer "honestly believed those reasons and acted in good faith upon those beliefs." Id. (internal quotations omitted).  "[T]he defendant's burden at this stage is one of production, not one of persuasion." Mirzai v. State of N.M. Gen. Servs., 506 F.Supp.2d at 775.

The Court finds that Las Cumbres has produced a legitimate, non-discriminatory reason for Aguilar's termination.  Because Las Cumbres has successfully "articulat[ed] some legitimate, non-discriminatory reason, 'the presumption of discrimination established by the prima facie showing "simply drops out of the picture."'" Id. (quoting Bryant v. Farmers Ins. Exch., 432 F.3d at 1125 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 511)).  The burden now shifts back to Aguilar, who is required to offer specific evidence that demonstrates the Las Cumbres' reasoning is pretextual.  See Branson v. Price River Coal Co., 853 F.2d at 771-772.

## VII.   AGUILAR DEMONSTRATES THAT LAS CUMBRES' LEGITIMATE, NON-DISCRIMINATORY REASON IS PRETEXTUAL.

The issue is whether Aguilar demonstrates that there are "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Las Cumbres]' proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that [Las Cumbres] did not act for the asserted non-discriminatory reasons." Morgon v. Hilti, Inc., 108 F.3d at 1323.  Las Cumbres' legitimate, non-discriminatory reason for terminating Aguilar was that "Aguilar was terminated from Las Cumbres after her supervisors reported to management that she turned in a time sheet on October 21, 2004, that misrepresented that she had worked a full shift when, in fact, she spent part of the claimed hours with her boyfriend."  Harris. Aff. ¶ 7, at 1.

-48-

A plaintiff typically shows pretext in one of three ways:

> [(i)] with evidence that the defendant's stated reason for the adverse employment action was false; [(ii)] with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or [(iii)] with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. A plaintiff who wishes to show that the company acted contrary to an unwritten policy or to company practice often does so by providing evidence that he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

Green v. New Mexico, 420 F.3d at 1193.

## A.   THERE IS NO INDICATION IN THE RECORD THAT HARRIS ACTED OUT OF AN AGE BIAS.

Aguilar has come forward with evidence that she did not "misrepresent that she had worked a full shift, when, in fact, she spent part of the claimed hours with her boyfriend."  Harris Aff. ¶ 7, at 1.  Aguilar denies having spent part, or any, of her claimed work hours with her boyfriend.  See Aguilar Depo. at 142:5-17.  Aguilar's witnesses support her contention.  See Garcia Depo. at 32:7-11; Piña Depo. at 7:22-8:3.

Las Cumbres contends that the "only relevant inquiry is whether Deborah Harris, the acting Executive Director who made the decision to terminate [Aguilar], had a legitimate belief that the information reported to her about plaintiff's behavior was true."  Supplemental Brief at 4.  Las Cumbres contends that Aguilar "must demonstrate that Deborah Harris had reason to doubt the veracity of the information she was receiving in order to demonstrate that Las Cumbres' non-discriminatory explanation is pretextual."  Id.  The Court believes that Aguilar may demonstrate pretext with "evidence that the defendant's stated reason for the adverse employment action was false."  Green v. New Mexico, 420 F.3d at 1193.  Because Aguilar has produced evidence that she did not spend claimed work hours with her boyfriend, she has demonstrated that Las Cumbres'

-49-

stated reason may have been false.  However, "a mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1231.

In Kendrick v. Penske Transport Services, Inc., "Kendrick, a black man, was hired as a truck driver for Penske . . . Kendrick was driving his truck through the gate of the Penske facility when Richard Tirrell, Penske Safety Supervisor and Driver Recruiter, signaled for Kendrick to stop . . . . . After Kendrick stopped, Tirrell told Kendrick [he] was driving too fast."  220 F.3d at 1223. Tirrell later accused Kendrick of charging at him, pushing him, and verbally abusing him. See id. The "undisputed evidence [in  Kendrick v. Penske Transport Services, Inc.] show[ed][ that [a supervisor] decided to terminate Kendrick based on his belief that Kendrick pushed Tirrell and then verbally abused him.  There was no evidence before [the supervisor] to suggest that Kendrick had not, in fact, made physical contact with Tirrell."  Id. at 1231.  The Tenth Circuit assumed that Kendrick did not push Tirrell, but noted that "a challenge of pretext requires [it] to look at the facts as they appear to the person making the decision to terminate the plaintiff."  Id.  Because Kendrick did not argue that the supervisor who terminated him was "simply a rubber stamp or conduit for an employment made in reality by underlings," the supervisor's decision to terminate Kendrick based on the incident with Tirrell was not pretextual.  Id.  The Tenth Circuit "conclude[d] that Kendrick's assertion that he did not, in fact, have physical contact with Tirrell [wa]s not sufficient to establish pretext."  Id. at 1232.

Like Kendrick's dispute of the reason for his termination in Kendrick v. Penske Transport Services, Inc., Aguilar contends that she did not misrepresent her work hours and spend work hours with her boyfriend.  See Aguilar Depo. at 142:5-17.  Aguilar's witnesses support her contention.

See Garcia Depo. at 32:7-11; Piña Depo. at 7:22-8:3.  Aguilar does not demonstrate, however, that Harris had any reason to doubt the information given or conveyed to her regarding Aguilar's misrepresentations on her work hours.  See  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d at 1231 (stating that "a challenge of pretext requires [it] to look at the facts as they appear to the person making the decision to terminate the plaintiff."); Harris Aff. ¶¶ 7, 9, at 1-2 ("Aguilar was terminated from Las Cumbres after her supervisors reported to management that she had worked a full shift when, in fact, she spent part of the claimed hours with her boyfriend. . . .  After management [received] additional reports from Aguilar's supervisors that she had been seen at her boyfriend's place of employment when she was supposed to be working, we decided to terminate her employment with Las Cumbres, effective January 6, 2005.").

Rather than trying to argue that Harris had some reason to doubt the information she received, and fired her anyway, Aguilar contends that "[t]he evidence, viewed as a whole, simply does not support [Las Cumbres'] contention that [she] materially falsified her time sheets." Response at 18.  Aguilar argues that Las Cumbres "rests on . . . the accounts of two of [Aguilar]'s coworkers, each with retaliatory motive against [her], and the Court must clearly see that this remains a material issue of fact."  Response at 19.  Aguilar contends that the alleged misrepresentation was a "single instance [when Aguilar] inadvertently mischaracterized certain hours as 'direct' services rather than 'indirect' services[,] did not result in any benefit to her, and were not part of any scheme to cover up for not being where she was supposed to be, as [Las Cumbres] contends." Response at 18-19.  Thus, Aguilar's primary argument remains that the reason given was incorrect, not that Harris had reason to question the information she dealt with.

Nevertheless, there may be problems with the information that Harris received which would

not have alerted her to doubt the information which she was receiving was inaccurate. Aguilar may

demonstrate that her termination was based upon an impermissible bias if, however, Harris relied

upon the reports, recommendations, or information provided by a biased subordinate.  See EEOC

v. BCI Coca-Cola, 450 F.3d at 484.  There is some indication in the record that Harris relied upon

information from persons who did have age bias.

### B. THERE IS SOME INDICATION THAT HARRIS ACTED UPON INFORMATION GIVEN BY SUBORDINATES WITH AN AGE BIAS.

There is some indication that Harris acted upon information given by Ritchie, Zamora, and

Chacon, who may have had a bias against Aguilar based on age.  Harris indicated that:

> Aguilar was terminated from Las Cumbres after her supervisors reported to management that she turned in a time sheet on October 21, 2004, that misrepresented that she had worked a full shift when, in fact, she spent part of the claimed hours with her boyfriend. . . .When management learned of Aguilar's misrepresentation, Aguilar's supervisors were told to watch for additional instances of similar behavior by Aguilar. . . .  After management received additional reports from Aguilar's supervisors that she had been seen at her boyfriend's place of employment when she was supposed to be working, we decided to terminate her employment from Las Cumbres, effective January 6, 2005.

Harris Aff. ¶¶ 7-9, at 1-2 (emphasis in original).  The record indicates that Ritchie, Zamora, and

Chacon acted in a supervisory capacity over Aguilar.  See Motion, Exhibit H, Defendant's

Responses to Plaintiff's Interrogatories to Defendant at 1;  Complaint ¶ 11, at 3.  Thus Harris acted

upon information given by Ritchie, Zamora, and Chacon.

There is also some indication in the record that Ritchie, Zamora, and Chacon had an age-

bias.  Aguilar testified that Ritchie "favor[ed] the young staff."  Aguilar Depo. at 69:18-19.  Aguilar

noted that Ritchie "wouldn't pay any attention to us.  She was always with Deborah or with Maria

[Zamora] or Carmen [Chacon]."  Id. at 69:3-6.  Aguilar testified that she would

> stay. . . awake all night thinking of this thing, why they were so mean to me and why

> they would do this and why Lynn [Ritchie] would favor the younger girls over me.
> And I thought maybe it was because, you know, they were always giving her gifts
> and stuff like that and things like that, and I -- they would share things in the
> computer and I couldn't do it because I didn't even know how to even turn on the on
> button because I was never in front of a computer.

Id. at 102:4-14.  Aguilar also noted that Chacon and Zamora made comments about Aguilar and

other employees' unfamiliarity with computers.  She testified:

> And we just -- we just -- we just felt out of place there.  We were just -- Carmen
> [Chacon] even -- one comment that Maria [Zamora] made that Lynn [Ritchie] said
> nothing about, we were talking about computers.  Well, Lynn [Ritchie] said that we
> were eventually going to have to go to computers instead of our time sheet.  We were
> going to go on the computer.  I have no knowledge of computers.  Annie [Garcia]
> did, and I'm not sure about Bertha [Rivera].  But Maria [Zamora] stated, she said, oh,
> I can see -- I can see maybe Annie, she said, learning the computer, but I can't see
> Adeline or Bertha.  They're too old.  And Lynn said nothing.

Id. at 69:10-19.  The issue is whether the biased "reports, recommendation, or other action [of

Ritchie, Chacon, and Zamora] caused the adverse employment action."  Id. at 487.  There is

evidence that Ritchie, Chacon, and Zamora exhibited some age bias, and that Harris relied upon their

information to "decide . . .  to terminate [Aguilar's] employment from Las Cumbres."  Harris Aff.

¶ 9, at 2.

Las Cumbres "can avoid liability by conducting an independent investigation of the

allegations against [Aguilar]."  EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles, 450 F.3d at

488.  Harris' affidavit, however, indicates that she relied upon Ritchie, Chacon, and Zamora to

investigate for her.  See Harris Aff. ¶ 8, at 1 (stating that "Aguilar's supervisors were told to watch

for additional instances of similar behavior by Aguilar.").  Aguilar has demonstrated that there is

a genuine issue of material fact whether Las Cumbres' non-discriminatory reason is pretext, because

Harris did not conduct her own independent investigation of the allegations against Aguilar, and

instead relied upon the information given by Ritchie, Chacon, and Zamora -- subordinates who may

have had an age bias.

Las Cumbres is not entitled to summary judgment as a matter of law, because there are genuine issues of material fact whether Aguilar was satisfactorily performing her job, whether she was replaced by a younger worker, whether similarly situated employees were treated differently, and whether Las Cumbres' non-discriminatory reason for terminating Aguilar was pretextual.

### C. AGUILAR IS NOT REQUIRED TO DEMONSTRATE, AT THIS STAGE OF THE PROCEEDING, THAT THE "REAL" REASON FOR HER TERMINATION WAS AGE-BIAS.

Las Cumbres also contends that Aguilar must demonstrate not only that its proffered non-discriminatory reason is false, but also that the "real" reasons for her termination were discriminatory. Supplemental Brief at 5-6. Las Cumbres argues that Aguilar has admitted to being "unaware of any facts indicating that her age was the reason for her termination." Las Cumbres' Memo. ¶ 3, at 2. Las Cumbres maintains that Aguilar's witnesses state that "they have no knowledge of facts indicating that [Aguilar]'s age was the reason or a reason for her termination." Id. ¶ 4, at 2.

"However [Aguilar] may choose to demonstrate pretext, [the Tenth Circuit] ha[s] definitively rejected a 'pretext plus' standard; in order to survive summary judgment, a plaintiff generally need not provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered explanation is pretextual." Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d at 1168. In certain instances, however, there are exceptions to this general rule. See id. The Court does not believe, however, that a deviation from the Tenth Circuit's general rule rejecting a pretext-plus standard is authorized in this case.

The record in this case does not "conclusively reveal . . . some other, non[-]discriminatory

-54-

reason for [Las Cumbres'] decision." Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d at 1168. Las Cumbres has offered only one non-discriminatory reason for Aguilar's termination, and Aguilar has offered varying explanations for her termination.  When Aguilar was asked in her deposition why she thought she had been fired, her response was that she thought she had been fired as retaliation for two things: (i) reporting co-workers to her supervisor for drinking at a Las Cumbres sponsored trip to a Toby Keith concert; and (ii) reporting co-workers to her supervisors for drinking at the Las Cumbres holiday party. See Aguilar Depo. at 46:18-47:16, 52:24-53-13, 55:11-16. None of these reasons have been conclusively established by Aguilar or Las Cumbres.

Additionally, Aguilar has not "created only a weak issue of fact as to whether [Las Cumbres'] reason was untrue," and there is not "abundant and uncontroverted independent evidence that no discrimination occurred."  Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d at 1168. Aguilar has demonstrated that Harris' decision to terminate her may have been based, at least in part, upon the reports and information given by biased subordinates -- Ritchie, Chacon, and Zamora. Lastly, Las Cumbres has not demonstrated that its purported differential treatment of "similarly-situated employees is trivial or accidental or explained by a non[-]discriminatory motive." Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d at 1168.

Because the Tenth Circuit has "definitively rejected a 'pretext plus' standard" and, because Aguilar has demonstrated that there is evidence that Las Cumbres' non-discriminatory reason is pretextual, the Court will not grant Las Cumbres' motion for summary judgment on Aguilar's federal claims.  Swackhammer v. Sprint/United Mgmt. Co., 493 F.3d at 1168.

## VIII.   LAS CUMBRES IS NOT ENTITLED TO SUMMARY JUDGMENT ON AGUILAR'S CLAIMS UNDER THE NMHRA.

The New Mexico courts apply the McDonnell Douglas framework to analyze claims under

-55-

the NMHRA.   See Juneau v. Intel Corp., 2006-NMSC- 002, ¶ 9, 127 P.3d at 551.  The Court has

determined that Las Cumbres is not entitled to summary judgment on Aguilar's federal claims under

the McDonnell Douglas framework.  Thus, the Court does not believe that Las Cumbres is entitled

to summary judgment on Aguilar's NMHRA claims.

## IX.   LAS CUMBRES IS ENTITLED TO SUMMARY JUDGMENT ON AGUILAR'S CLAIM FOR WRONGFUL DISCHARGE.

The tort of wrongful discharge is "a means of redress for the very limited situation in which

an employee has no other means of protection against an employer's breach of public policy. If the

employee already has some protection, either because of an employment contract or through another

cause of action, the tort is unnecessary and will not be recognized." Salazar v. Furr's, Inc., 629 F.

Supp. at 1409.  The Court does not believe that Aguilar can bring a claim for wrongful discharge,

because Aguilar already has means of protection for her alleged wrongful termination through the

federal statutes and the NMHRA.  See Mayo v. Fowler Fitness, Inc., No. CIV 02-0222 JB/RLP,

Memorandum Opinion and Order at 40-42, filed October 8, 2003 (Doc. 99)(noting that the plaintiff

did not dispute that her claim for wrongful termination was identical to and indistinguishable from

Title VII claims alleging retaliation and, because the plaintiff had identical remedies available to her

under Title VII, the defendant was entitled to judgment as a matter of law on her wrongful

termination claim); Salazar v. Furr's, Inc., 629 F. Supp. at 1408 (holding that, because "the public

policies that may have been violated . . . can be vindicated under the federal legislation, and perhaps

under the [NMHRA] as well, the Court finds that the tort of wrongful discharge will not lie.").

Thus, Las Cumbres is entitled to summary judgment as a matter of law on Aguilar's wrongful

termination claim.

X.    **LAS CUMBRES IS ENTITLED TO SUMMARY JUDGMENT ON AGUILAR'S STATE CONTRACT CLAIMS.**

Under New Mexico law, unless there is an explicit contract of employment stating otherwise, employment is terminable at will.  See Sanchez v. The New Mexican, 106 N.M. at 78, 738 P.2d at 1323 ("[U]nless there is an explicit contract of employment stating otherwise, employment is terminable at will.")(internal quotations omitted). In her Complaint, Aguilar contends that she had an explicit written contract with Las Cumbres. Aguilar argues that, "[w]hile [she] was employed by [Las Cumbres], the [parties'] employment relationship was governed by an employment agreement, which was both express and in writing."  Complaint ¶ 54, at 10.  Moreover, she contends that "[t]his employment agreement governed the terms, conditions, and privileges of employment, including but not limited to her rights as an employee to promotions, demotions, benefits, sick leave, and termination."  Id.  In her Response, Aguilar argues that she had an implied contract based upon her Employee Handbook.  See Response at 19-21.

Aguilar did not have an express contract with Las Cumbres, and signed documents acknowledging that she had no express contract with Las Cumbres.  See Acknowledgments at 2 (stating that "I have entered into my employment relationship with Las Cumbres voluntarily and acknowledge that there is no specified length of time of my employment.  Accordingly, either Las Cumbres or I can terminate the relationship at will, with or without notice or reason, at any time.").  Aguilar also does not have an implied contract with Las Cumbres.  "New Mexico recognizes two exceptions to this general rule, however: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge."  Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 10, 918 P.2d at 10 (internal quotations omitted). The Supreme Court of New Mexico has explained that "whether an implied contract exists

is a question of fact, and it may be 'found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct.'" Id. ¶ 10, 918 P.2d at 10 (quoting Newberry v. Allied Stores, Inc., 108 N.M. at 427, 773 P.2d at 1234).

Aguilar signed and dated acknowledgments, stating that he had received the Employee Handbook and agreed to read the handbook fully and completely. See Acknowledgments. One Acknowledgment stated: "I acknowledge that this handbook is neither a contract of employment nor a legal document." Id. at 2. The Employee Handbook states that "Las Cumbres Learning Services, Inc . . . is an AT WILL employer. The employee or [Las Cumbres] may terminate employment at any time, with or without notice and for any reason. No agreement to the contrary will be recognized unless such an agreement is in writing and signed by the Executive Director." Employee Handbook at 2.

Aguilar contends that the disclaimer in the Handbook Acknowledgment is not dispositive. See Response at 20. In McGinnis v. Honeywell, the plaintiff-employee signed an express employment agreement with her employer, Honeywell. See 110 N.M. at 2, 791 P.2d at 454. The employment agreement between the parties provided: "My employment is in accordance with any applicable written agreement and applicable personnel practices published to employees, and subject to such agreements or practices, may be terminated by me or by Honeywell at any time. . . ." McGinnis v. Honeywell, 110 N.M. at 3, 791 P.2d at 454. Honeywell went through two workforce reductions, McGinnis' employment position was eliminated, and she was laid off. See id. at 3, 791 P.2d at 454. Honeywell had a "workforce realignment guide [that provided] in the event of a reduction in force, an exempt employee like McGinnis had the option to take a nonexempt position

-58-

if he/she formerly held that job family." McGinnis v. Honeywell, 110 N.M. at 3, 791 P.2d at 454. (internal quotations omitted).

The Supreme Court of New Mexico in McGinnis v. Honeywell was "struck by the fact that the parties at trial by and large confined themselves to a dispute about whether or not an implied contract existed, without addressing the point, which struck [the Court] as fairly obvious, that there was an express contract." McGinnis v. Honeywell, 110 N.M. at 5, 791 P.2d at 456. Honeywell argued that the jury's favorable verdict for McGinnis on the implied-contract issue may have been because it "adopted the common-sense view that, since the parties had signed an employment agreement containing a promise by Honeywell to lay off McGinnis only in accordance with certain procedures specified in the work force realignment guide . . . then the parties' conduct was sufficient to manifest an intention to be bound by the agreement." McGinnis v. Honeywell, 110 N.M. at 1, 5, 791 P.2d at 452, 456. The Supreme Court of New Mexico noted that "'[a] contractual disclaimer does not automatically negate a document's contractual status and must be read by reference to the parties' norms of conduct and expectations founded upon them." McGinnis v. Honeywell, 110 N.M. at 6, 791 P.2d at 457.

The Acknowledgment that Aguilar signed specifically provided that: "I acknowledge that this handbook is neither a contract of employment nor a legal document." Acknowledgments at 2. Unlike the parties in McGinnis v. Honeywell, Aguilar and Las Cumbres had no express contract that incorporated the Handbook by reference. See McGinnis v. Honeywell, 110 N.M. at 5, 791 P.2d at 456 (stating that it was obvious to the Supreme Court of New Mexico that the parties had an express contract). Aguilar therefore still must prove the Handbook's terms were "sufficiently explicit to create a reasonable expectation of an implied contract." Trujillo v. N. Rio Arriba Elec. Coop., Inc.,

2002-NMSC-004, ¶ 22, 41 P.3d at 342.

The Handbook specifically provided that the employment relationship was at-will: "Las Cumbres Learning Services, Inc . . .is an AT WILL employer.  The employee or [Las Cumbres] may terminate employment at any time, with or without notice and for any reason.  No agreement to the contrary will be recognized unless such an agreement is in writing and signed by the Executive Director." Employee Handbook at 2.  Thus, it would be unreasonable for Aguilar to expect an implied contract from the language in the Employee Handbook.  See Trujillo v. N. Rio Arariba Elec. Coop., Inc., 2002-NMSC-004, ¶ 22, 41 P.3d at 342 (stating that, for a personnel manual to create contractual rights its terms "must be sufficiently explicit to create a reasonable expectation of an implied contract").  Viewing the facts in the light most favorable to Aguilar, there is no material question of fact the Acknowledgments or the Employee Handbook altered the employment relationship between Aguilar or Las Cumbres.  Summary judgment is appropriate on Aguilar's implied-contract and express-contract claims, because there are no genuine issues of material fact whether the relationship between Aguilar and Las Cumbres was at will.  Las Cumbres is entitled to judgment as a matter of law on Aguilar's claims of implied or express contract.

Because the Court has ruled that there was no express or implied contract between Aguilar and Las Cumbres, Las Cumbres is also entitled to summary judgment as a matter of law on Aguilar's claim of breach of implied covenant of good faith and fair dealing.  See Martinez v. New Mexico Dep't of Health, 2006 WL 4079690 at *14 (noting that a "cause of action for breach of the implied covenant of good faith and fair dealing cannot prevail without an accompanying showing for breach of contract.")(citing Azar v. Prudential Ins. Co. of Am., 2003-NMCA-062, ¶ 51, P.3d at 925).

**IT IS ORDERED** that Defendant Las Cumbres Community Service's Motion for Summary

Judgment is granted in part and denied in part.  Las Cumbres is not entitled to summary judgment on Aguilar's federal law claims or her NMHRA claim.  Las Cumbres is entitled to summary judgment on Aguilar's state claims for breach of contract, breach of implied covenant of good faith and fair dealing, and wrongful discharge.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Gilbert J. Vigil
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

Randy S. Bartell
Holly Agajanian
Montgomery & Andrews, P.A.
Santa Fe, New Mexico

    *Attorneys for the Defendant*